**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Action No.:**

THE UNITED STATES OF AMERICA )
United States Department of Justice )
950 Pennsylvania Avenue, N.W. )
Washington, D.C. 20530-0001, )
)
*ex rel.* SHILOG, LTD., )
3551 Mt. Moriah Road )
McAlester, OK 74501 )
)
Plaintiff, )
vs. )   **COMPLAINT**
)
CARDINAL HEALTH, INC., )   *__Filed Under Seal__*
CARDINAL HEALTH 200, INC., )   *Pursuant to 31 U.S.C. § 3729, et seq.*
CARDINAL HEALTH 200, LLC, )
ALLEGIANCE CORPORATION, )
OWENS & MINOR, INC., and )
OWENS & MINOR DISTRIBUTION, INC. )
)
Defendants. )
_____)

    **RELATOR SHILOG, LTD.,** brings this *qui tam* action by and through counsel on

behalf of the United States of America, and alleges as follows.

## NATURE OF THE CASE

    1.    This is a *qui tam* action under 31 U.S.C. §§ 3729 *et seq.* by Shilog, Ltd., on behalf

of the United States, against Defendants Cardinal Health, Inc., Cardinal Health 200, Inc.,

Cardinal Health 200, LLC, Allegiance Corporation, and Owens & Minor, Inc., Owens & Minor

Healthcare Supply, Inc., and Owens & Minor Distribution, Inc., to recover penalties and

damages arising from numerous, past and ongoing false claims knowingly submitted by the

Defendants to the United States Department of Defense, and its subservient agencies, and other

government agencies to include the Department of Veterans Affairs, and its subservient agencies,

as well as false records or statements material to such false or fraudulent claims, for the purpose of receiving payment under the departments' Prime Vendor programs for medical and surgical supplies.

## PARTIES

2.      Shilog, Ltd., is a corporation organized and existing under the laws of the state of Oklahoma, with its principal place of business in McAlester, Oklahoma.   Shilog is in the business of distributing medical supplies and equipment.   Shilog at all times relevant to this action has been a participant in the government program described herein for the purchase of medical supplies.   Shilog has direct and independent knowledge of the information upon which the allegations of this complaint are principally based, including the facts alleged herein regarding the nature and operation of the medical and surgical equipment distribution "Prime Vendor Program," the Defendants' conduct within that Program in relation to Shilog, and the effect of the Defendants' conduct on the Prime Vendor Program.   As a result thereof, Shilog brings this action as Relator on behalf of the United States.

3.      Cardinal Health, Inc., is a corporation organized and existing under the laws of the state of Ohio, having its principal place of business in the state of Ohio and conducting business operations nationwide.   In 1999, Cardinal Health, Inc., purchased Allegiance Healthcare Corp., which the Relator is informed and believes, and therefore alleges, the Department of Defense awarded a Prime Vendor contract in 2000 as a subsidiary of Cardinal Health, Inc.

4.      Cardinal Health 200, Inc., is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business in the state of Illinois.   The Relator is informed and believes, and therefore alleges, that Cardinal Health 200, Inc., was formerly known as Allegiance Healthcare Corp., was the medical products and services

subsidiary of Cardinal Health, Inc., until in or about July 2009 and conducts business nationwide.

5.      Cardinal Health 200, LLC, is a limited liability corporation organized and existing under the laws of the state of Delaware, having its principal place of business in the state of Illinois.  The Relator is informed and believes, and therefore alleges, that Cardinal Health 200, LLC, was created in or about July 2009 by conversion of Cardinal Health 200, Inc., and conducts business nationwide.

6.      Allegiance Corporation is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business in the state of Illinois.

7.      Owens & Minor Inc., is a corporation organized and existing under the laws of the state of Virginia, having its principal place of business in the state of Virginia.

8.      Owens & Minor Distribution, Inc., is a corporation organized and existing under the laws of the state of Virginia, having its principal place of business in the state of Virginia.

## JURISDICTION AND VENUE

9.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

10.     The Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1331.

11.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because the Defendants transact business in this district and one or more acts prescribed by § 3729 *et seq.* occurred in the district.

## FACTUAL ALLEGATIONS

### The Defendants

12.     Relator is informed and believes, and therefore alleges, that Cardinal Health, Inc., is the parent of all Cardinal corporations named herein.

13.     Cardinal Health 200, Inc., is identified in the relevant contracts to which a Cardinal corporation is a party as the recipient of Prime Vendor contracts awarded by the Department of Defense (herein "DoD"), including the contract awarded on April 4, 2011, for so-called Generation IV of the program described herein.

14.     Nevertheless, Relator is informed and believes, and therefore alleges, that Cardinal Health 200, Inc., was converted to Cardinal Health 200, LLC, in or about July 2009. Therefore, Cardinal Health 200, LLC, a member-managed limited liability company, is named as a Defendant and all acts and practices ascribed to Cardinal Health 200, Inc., are alleged to have continued under Cardinal Health 200, LLC (herein collectively "the Cardinal Defendants").

15.     Relator is informed and believes, and therefore alleges, that Allegiance Corporation is a wholly-owned subsidiary of Cardinal Health, Inc., and is the sole member of Cardinal Health 200, LLC.

16.     Relator is informed and believes, and therefore alleges, that an associate general counsel for Cardinal Health, Inc., is an officer of Allegiance Corporation.

17.     Relator is informed and believes, and therefore alleges, that at all times relevant to the allegations herein, Cardinal Health, Inc., and the Cardinal Defendants shared common officers, directors and/or corporate executives.

18.     Other subsidiaries of Cardinal Health, Inc., benefited from the actions of the Cardinal Defendants in that, as more fully described herein, they held sales contracts with the United States known as DAPAs or otherwise did business with the DoD Prime Vendor Program. Relator also alleges that in presenting false claims for payment by the United States for certain transactions involving these particular DAPAs, the Cardinal Defendants acted for the benefit of these other sister companies (herein collectively "Cardinal Companies").

19.     Relator is informed and believes, and therefore alleges that at all times relevant to the allegations herein, Cardinal Defendants and Cardinal Companies shared common officers, directors and/or corporate executives.

20.     Relator is informed and believes, and therefore alleges, that Owens & Minor, Inc., is the parent company of Owens & Minor Healthcare Supply, Inc., and Owens & Minor Distribution, Inc.

21.     Prime Vendor Contracts herein referenced as Generation II and Generation III were awarded to "Owens & Minor," which the Relator is informed and believes, and therefore alleges, refers to Defendant Owens & Minor, Inc. (herein "Owens & Minor").   The contract herein referenced as Generation IV was awarded to Owens & Minor Distribution, Inc.   The Relators are informed and believe, and therefore allege that the conduct described as occurring under the contracts awarded to an Owens & Minor company is imputed to both Owens & Minor and Owens & Minor Distribution, Inc. (herein the "Owens & Minor Defendants").

22.     Relator herein alleges that in presenting false claims for payment from the United States for certain transactions involving DAPAs held by Owens & Minor subsidiaries (herein "Owens & Minor Companies"), the Owens & Minor Defendants acted for the benefit of these subsidiaries.

23.     The Cardinal Defendants and Owens & Minor Defendants are at times collectively referenced herein as the "Defendants."

**Summary of the Allegations**

24.     From 2001 through 2008, the United States paid false claims made by the Defendants amounting to as much as $661,563,965. Those payments—all or substantially all of which the Relator is informed and believes, and therefore alleges, were made in violation of the

False Claims Act—constituted 27.4 percent of the $2,416,612,131 spent by the United States on medical-surgical supplies for Department of Defense health-care facilities during that period. The Relator is informed and believes, and therefore alleges, that those transactions and the False Claims Act violations represented by them are representative of unlawful acts that continued at least through calendar year 2011.

25.    The Relator (hereinafter "Relator" or "Shilog"), a medical supply distributor, learned about the existence and mechanisms of this illicit conduct through its experience as a participant in the program established by the United States to procure medical supplies for military facilities, known as the "Prime Vendor Program" (hereinafter the "PV Program"), a program whose systems are used by other federal agencies which thus also have paid false claims submitted by the Defendants because of the fraudulent conduct described herein. Through independent investigation over a number of years after the Defendants gained control over the program and the Relator's sales plunged, the Relator learned that the Defendants were engaging in actions that not only injured the Relator's business relationships and diminished its market share but also injured the United States by undermining the cost-saving objectives of the program.

26.    The false claims described herein involve numerous omissions and misrepresentations to the United States and breaches of material terms of the Defendants' contracts with the United States, without disclosure of those breaches upon Defendants' presentation of claims for payment. These acts include: the knowing submission of false data upon which the United States relied for operation of the procurement program and which has caused the submission and payment of false claims; the knowing submission of claims generated in direct violation of material contractual terms upon which the Defendants were to operate the

program; and the knowing submission of claims for payment to themselves for purchases diverted from other program participants in material violation of their contractual obligations.

27.     These omissions and misrepresentations were facts material to decisions by the United States to pay each such claim, for the true nature of the information provided to government facilities by these Defendants would have revealed that the Defendants had undermined the objectives of the PV Program, which payment of those claims would not serve.

28.     Defendants were hired by the government to operate the PV Program worldwide, which included the generation, management, and distribution to United States purchasing facilities of product-availability and pricing data for the purpose of creating a competitive environment in which each facility could make purchasing decisions based on cost effectiveness.

29.     A central element of the fraud alleged herein is that when charged by the United States with accurately presenting to government medical facilities all medical-surgical items available for them to purchase, Defendants knowingly misrepresented those options, which were facts material to the United States government's decision to pay the claims submitted by Defendants.  Defendants knowingly and systematically omitted from mandatory submissions to the United States information required to present government buyers with the true array of products and suppliers available, causing the United States to purchase products directly from the Defendants without the competition that the PV Program was intended to establish.

30.     The Plaintiff is informed and believes, and therefore alleges that these omissions and misrepresentations of material facts by Defendants were made on a monthly basis, on or about the fourteenth day of each month, beginning in the year 2000 and continuing at least through 2011.

31.     Particularly due to clear recitations by the United States of the program's intent

and goals, and clear contractual mandates for reporting this data and ensuring its accuracy, these omissions and misrepresentations were knowingly made, and the United States reasonably relied on these omissions and misrepresentations of material facts. Defendants were contractually obligated to disclose the withheld information to the United States.

32.     Defendants knew that their creation and management of information critical to sustaining a competitive marketplace for medical supplies within the PV Program, and their accurate presentation of that information to United States purchasers, was material to the government's decision to pay distribution fees and invoices presented to the government for items delivered to purchasing facilities.

33.     As a result of these omissions and misrepresentations of material facts, Defendants submitted to the United States thousands of claims for payment, in the form of invoices, for transactions that would not have occurred but for the Defendants' fraudulent acts. Each claim for payment for an item that was not subject to the competitive selection process omitted the material fact that Defendants had provided misleading information to the purchasing facility, thereby preventing that facility from undertaking the cost-effectiveness analysis that it was required by the United States to undertake.    Defendants knew that establishing this competitive process was the reason that the United States created the PV Program.

34.     In many sales identified by Shilog, the United States paid higher prices than it reasonably would have paid had those transactions been subject to the cost comparisons that Defendants thwarted. Furthermore, Defendants collected distribution fees as compensation for providing the basic services, including the information creation, management, and distribution functions that they knowingly failed to provide.

35.     Shilog's investigation also revealed specific instances in which agents of

Defendants provided government facilities with purchasing information that caused them to unwittingly buy items from Cardinal Companies or Owens & Minor Companies after those facilities asked for assistance in purchasing the items from Shilog.   Using the information supplied by the Defendants' Customer Service Representatives, government personnel believed they were buying products from Shilog when they were not.

36.   As a result of these acts, omissions, and misrepresentations, the United States has never captured the benefits it intended by establishing the Prime Vendor Program, which was expressly designed to leverage market competition for savings, because the Defendants systematically reduced opportunities for competition and captured ever greater shares of the total market for themselves.

**Structure of the Prime Vendor Program**

37.   The Department of Defense (herein "DoD") maintains a health-care system of hospitals and clinics worldwide for the purpose of treating members of the military and their families.

38.   The DoD traditionally supplied its global health-care facilities with pharmaceuticals and consumable medical supplies by purchasing them directly from individual manufacturers and vendors.   That system of government contracting often resulted in excessive inventories, clogged supply chains, and wasted money.

39.   Under pressure from Congress in the early 1990s to emulate civilian contracting methods to save taxpayer dollars, the Defense Logistics Agency ("DLA"), the procurement and supply arm of the DoD, turned its attention to the military's vast and expensive network of medical facilities.   The U.S. General Accounting Office, now the Government Accountability Office (herein "GAO"), in 1991 proposed a complete overhaul of the DoD's procurement system

for health-care supplies.

40.    In response to the GAO proposal, and resulting support for the concept on Capitol Hill, DoD's Defense Personnel Support Center of Philadelphia, better known as the Defense Supply Center, Philadelphia ("DSCP"), developed two "Prime Vendor" programs to establish contracts with distributors on a regional geographic basis for the sale of all pharmaceutical and medical/surgical products to DoD facilities and other branches of the U.S. government.    To manage these new Prime Vendor programs, DoD created the Defense Medical Logistics Standard Support (herein "DMLSS") system, which included military service representatives and DSCP personnel.

41.    The PV Program described herein involves only the Medical-Surgical PV Program.

42.    The DoD program for medical supplies also is used by other government agencies, including the Department of Veterans Affairs (herein "VA").

43.    The Relator is informed and believes, and therefore alleges, that the conduct described herein with respect to the DoD PV Program has caused substantially the same harm to the VA and its purchasing networks and facilities.    Cardinal Health 200, Inc., is currently the Prime Vendor of record for the VA's Medical Surgical PV Program covering sixteen of the VA's twenty-three Veterans Integrated Service Networks, as well as for Alaska and Hawaii, but by virtue of the 2009 conversion, the Relator is informed and believes, and therefore alleges, that the holder of that contract is Cardinal Health 200, LLC.

44.    The omissions and misrepresentations embodied by Cardinal's monthly data submissions to the DSCP, as described more fully herein, were material facts upon which the VA, like the DoD, based its decision to pay claims submitted by Cardinal Defendants as part of a

process intended to produce cost-effective purchasing through the accurate and timely presentation of options to medical facilities.

45.     Other government agencies also use the DoD PV Program for their purchases. The behavior described herein therefore has affected other purchasing agencies, including the VA, and the Relator is informed and believes, and therefore alleges, that all such improper claims are actionable under the False Claims Act.

46.     The Relator is informed and believes, and therefore alleges, that in 2000 the DSCP awarded Prime Vendor contracts to Cardinal Health 200, Inc., then named Allegiance Healthcare Corp., and again in 2005 and 2011. (Cardinal Health 200, Inc., was converted to Cardinal Health, LLC, in 2009 but that is not reflected by the 2011 contracts.) The Relator also is informed and believes, and therefore alleges, that sister companies Cardinal Health 213, Cardinal Health 303, and Cardinal Health Solutions, Inc., knowingly benefited from and participated in the False Claims Act violations alleged herein by selling products to DoD facilities without the cost comparisons that the PV Program was designed to allow, as a direct result of Cardinal's omissions and misrepresentations.

47.     Cardinal Health 213, Cardinal Health 303, and Cardinal Health Solutions are subsidiaries of Cardinal Health, Inc.

48.     The Relator is informed and believes, and therefore alleges, that DSCP awarded Owens & Minor Prime Vendor contracts in 2000 and 2005, and that Owens & Minor Companies knowingly benefited from and participated in the False Claims Act violations alleged herein. Furthermore, Owens & Minor Distribution, Inc. was awarded a Prime Vendor contract in April 2011.

49.     The DoD Medical Surgical PV Program was created with two components. First,

DSCP would enter into pricing agreements with manufacturers and/or distributors of medical supplies. Second, the DSCP would enter into agreements establishing Prime Vendors for the distribution of those pharmaceuticals and medical supplies on a regional basis.

50.     The DLA approved the program on July 15, 1992.

51.     The DLA has three times revised the PV Program, its technical requirements and tools, and the associated contracts with PVs and backup vendors, with full implementation of those changes in August 2001 ("Generation II"), February 2006 ("Generation III"), and expected in April 2012 ("Generation IV").

52.     The financial stakes are large. The dollar volume flowing through this program has grown rapidly, but the Defendants' omissions and misrepresentations, and resulting false claims for payment by the government, and their anti-competitive behavior as described herein, have rendered ineffectual the program that the United States implemented to save taxpayer dollars.

53.     As described more fully below, in 1999 the PV Program transacted approximately $116.3 million in purchases by DoD facilities and grew to about $506.4 million in purchases in 2008. From 1998 through April 2009, Defendants and their subsidiaries claimed a growing share of the market created by the DoD PV Program, with the result that the Defendants and their related companies alone captured more than 35 percent of all sales of medical supplies to DoD facilities during that time.

54.     Under all iterations of the PV Program, prime and backup vendor contracts have been awarded on a regional basis, although the regional definitions have changed. Under Generation III, contracts were awarded to two PVs and two Backup Vendors in each of three global regions corresponding to the military's TRICARE system. They are known as Global

North, South, and West. A logistics panel selects one PV for each Tri-Service Regional Business Office (herein "TRBO") within the global regions for a twenty (20) month period.

55.     Since 2000, Cardinal Defendants and Owens & Minor Defendants have been the only Prime Vendors selected to operate the PV Program in any of the global regions, as well as in their constituent geographic components.

56.     At the heart of the PV Program from the beginning was the creation of the Distribution and Pricing Agreement (herein "DAPA").

57.     Beginning in 1993, each product manufacturer and/or supplier would receive a DAPA for each product they wished the PVs to sell to purchasing medical facilities. A DAPA sets the price at which the DAPA holder has agreed to sell that product to the DSCP, and its issuance certifies that the DoD Contracting Officer has determined it is "fair and reasonable." A single DAPA may cover numerous individual items, but it identifies the seller to be credited when an item with a particular manufacturer name and part number is selected for purchase by a facility from that DAPA holder (for there may be more than one DAPA holder offering a given item for sale). This selection is expected to be based on cost comparisons of different DAPA prices for the same or functionally equivalent item offered by various DAPA holders.

58.     The PV Program is intended to be the most cost-effective method of product acquisition available to medical facilities.

59.     Under the program as it was originally designed and implemented, the DLA did not provide for PVs to also hold DAPAs, and in fact the DLA articulated the reasons that such a dual role would undermine the program. The government was concerned that allowing PVs to also hold DAPAs would allow them to dictate the price of an item as well as the cost to manage and deliver it, potentially obscuring the reasonableness of delivered prices.

60.     As described herein, the DLA's concerns were prescient. This system has indeed been abused by PVs that have played their gate-keeping role for self-advantage, particularly since they have been allowed to hold DAPAs of their own or sell items under DAPAs held by sister corporations while controlling the means by which purchasing facilities search for and order their medical supplies. Furthermore, as described herein, the market control given to the PVs has allowed them to sell DoD higher priced items outside the DAPA system in violation of their contracts with the DoD.

61.     The program has evolved over time, and the data systems required to support it have grown accordingly. The PV Program required a series of product coding changes throughout the medical supply industry. A principal objective was to give medical facilities the ability to uniformly identify a product offered by a DAPA holder, or multiple DAPA holders, and compare it to other DAPA-assigned products with the same or similar functions, thereby injecting competition into the purchasing process. New databases and computer tools were created to allow such shopping by the medical facilities, which then were to place orders through their PVs at a savings to the government.

62.     The Prime Vendors receive a base distribution fee for taking and processing orders, and delivering those items to military facilities, as well as for creating, maintaining, and distributing the data necessary for each facility to compare prices and conduct transactions. This fee may vary upward depending on the level of service selected by individual facilities.

63.     Relator is informed and believes, and therefore alleges, that at all times relevant to this action subsidiaries of Cardinal Health, Inc., have owned proprietary software called Supplyline, which is used to filter DoD data from the Medical Surgical PV Program to assign codes that PVs and purchasing facilities use to identify and compare products with the same or

similar uses.

64.    The new data systems included the DAPA Management Application and an associated database, through which a manufacturer or distributor may go online to apply for a DAPA allowing it to sell a new product to DoD.   DoD also created the Universal Data Repository, known as the DoD/DVA Master Catalog (herein "Master Catalog").   The Master Catalog is essentially a computerized catalog of products that DoD purchasing facilities and PVs are required to use to compare and select items, and it also includes distinct contract items for use by the DoD, VA and other government agencies.

65.    It is the shared use of this catalog by VA and other agencies that has also allowed them to be subject to the same False Claims Act violations that the Defendants have committed with respect to the DoD.

66.    Despite these technological creations, the system still depends on critical data input from the PVs, which, it turns out, provides the PVs with opportunities to manipulate the outcome of a purchasing facility's search for needed products.

67.    Purchasing facilities are expected to use the Master Catalog to select items that offer the best value based on an overall cost analysis of products available from the PV.

68.    Each month, the DSCP compiles the data pertaining to new DAPAs issued in the previous thirty days and supplies that information to the other databases so that the PV Program, including the Master Catalog, is regularly updated with new DAPAs.

69.    Within four days of the DSCP posting the new monthly DAPA data, which normally occurs on the tenth day of the month, each PV is required to assign a Prime Vendor Order Number ("PVON") to each new DAPA item and transmit that PVON to the DSCP.   In order for a medical facility to place an order for a DAPA item, it must have a PVON, which

indicates that the PV for that region in fact stocks that item for sale to its DoD customers.

70.     This PVON assignment, as shown below, has become a key to allowing PVs to violate the False Claims Act routinely.

71.     As originally conceived, PVs were only to supply products that were covered by a DAPA or indefinite quantity contract.  The PVs were to have no control over the source of the products they supplied to fill the orders of purchasing facilities.

72.     The objective of the PV Program was to put downward pressure on prices by creating competition among suppliers at the point where the purchasing facilities place their orders with PVs for items meeting the facility's needs, considering the prices listed for DAPA products in the Master Catalog.

73.     Early in the program, however, few products had DAPAs.  To facilitate purchases by individual DOD facilities, the DSCP created the Alternate Commercial Product Ordering Program (herein "ACPOP").  When a facility wished to order a product that was not yet available under a DAPA but was in a PV's inventory, it could place the order with the PV under the ACPOP.

74.     Rather than fading away with the natural proliferation of DAPAs as the PV Program took root, ACPOP became an enduring part of the PV system.

75.     These parallel procurement systems were not supposed to overlap.  PV contracts require that before ordering an item through the ACPOP, facilities must check for a DAPA for that item or an acceptable alternative.

76.     A purchasing facility may make an ACPOP order only when it has investigated alternatives and determined that the ACPOP price is the best overall value to the purchasing facility.

77.     If a facility inadvertently orders an item with a DAPA through the ACPOP, the PV's automated order system, which all PVs are required to have, must process the item as a DAPA sale and sell the DAPA item at the DAPA delivered unit price. The PV also must alert the customer to the error and notify the DSCP when such errors are repeated.

78.     When a PV makes a sale through the ACPOP, the PV warrants that its ACPOP price is its best customer price under similar terms and conditions.

79.     Despite such contractual obligations on the part of the PVs, the control that the PVs exert over the system has allowed them to exploit the dual DAPA-ACPOP structure to charge the government higher prices for items that it should receive at a discount.

80.     Because the PVs are responsible for coding new items with PVONs that are critical to the accurate fulfillment of facility orders, and because the PVs are responsible for noticing when facilities order items through the ACPOP even though the item has an existing DAPA, the program allows for abuse by the PVs and widespread violations of the False Claims Act.

81.     It is important to note that because DAPAs may be held by distributors as well as manufacturers, the same product often has multiple DAPAs and multiple PVONs assigned to it. The Relator is informed and believes, and therefore alleges, that beginning in or about October 1996, Cardinal Companies and Owens & Minor Companies have applied for and received DAPAs for items the Defendants purchase and stock in their inventories.

82.     As part of the program, furthermore, PVs are required to send a Customer Service Representative ("CSR") to each client DoD facility at least once per week, unless such schedule is waived by the client facility. These CSRs are expected to assist the facility "in the identification of DAPA/ACPOP usage data items" and other functions related to purchasing and

efficient delivery. The PVs must offer, and the purchasing facility may accept, a full-time on-site CSR to provide such assistance on a daily basis.

83.    The Relator is informed and believes, and therefore alleges, that all or substantially all DoD purchasing facilities of significant size have opted for a full-time on-site CSR.

84.    A CSR asked to research an item for purchase—perhaps even identified by manufacturer part number and manufacturer—may therefore then simply provide the purchasing facility with a PVON that identifies that product and which the facility may use to place its order in the future.  The CSR may have had numerous items to choose from, but the facility will not know the basis for the CSR's recommendation.

85.    While the use of CSRs tends to distance the facility from the decision-making process about which product to purchase and from whom, the facility also is not fully informed about the true cost of the item.  The only price visible to the purchasing facilities is the Delivered Unit Price, which for DAPAs includes the PV's Distribution Fee and the applicable Cost Recovery Rate ("CRR") and for the ACPOP items includes the CRR but no Distribution Fee.

86.    With the component fees hidden from the purchasing facilities and the PV often responsible for selection of items and the entry of PVONs then supplied to the purchasing facility for future use, the system may be abused: 1) through the manipulation of facility orders to divert business to certain DAPA holders at the expense of others who might have received the order had the facility conducted its own research, and 2) through the improper use of the ACPOP.

87.    When a purchasing facility wishes to order a particular item, it is required to use the Master Catalog to make its selection.  The Master Catalog contains the universe of products

offered by every DAPA holder and every medical supply contract held by the DoD, whether stocked by the facility's PV or not.

88.     If the purchasing facility representative selects an item that already has a PVON assigned to it, and the item is indicated as stocked by the PV, the representative may simply order that item. If, however, the item has a PVON but is not yet stocked by the PV, or the PV has not yet assigned a PVON to the item, the representative must ask the CSR to either request the item with the PVON to be stocked or to provide the purchasing facility with a PVON that it may use to place an order after the item has been stocked.

89.     The Relator is informed and believes, and therefore alleges, that the Defendants routinely fail to meet their contractual obligation to timely assign PVONs once new DAPAs are added to the relevant databases, including the Master Catalog, on a monthly basis. The result is that many DAPA items are not available for ready purchase by purchasing facilities and that the Defendants, once alerted to a forthcoming request to stock the item, are at a competitive advantage.

90.     In such cases, the PV may simply assign a PVON to the DAPA, just as it should have done according to the program's regulations. The Relator is informed and believes, and therefore alleges, however, that the Defendants frequently either use the ACPOP to make the purchase, although the program's rules are supposed to prevent this, or suggest that the facility use a functionally equivalent product with a DAPA held by that PV or a subsidiary.

91.     Furthermore, when a purchasing facility representative is provided with the manufacturer name and part number for a DAPA item without a PVON in the Master Catalog, the CSR then searches for that item in the PV's own database. If the PV has assigned a PVON for the same item under its own DAPA or one held by a sister company, but has not assigned a

PVON to any other DAPA holder for that item, that PV's PVON will be provided to the purchasing facility for future use even though competing DAPAs may exist but have not been properly assigned PVONs. The Relator is informed and believes, and therefore alleges, that on a monthly basis since becoming PVs in 2000, the Defendants have failed to assign PVONs to DAPA items offered by other suppliers with the result that only that item offered under the PV's or a sister company's DAPA, for which a PVON has been assigned, will be selected by the purchasing facility.

92.     While the facility knows that it has received the very item it ordered, it would not know the difference, for example, if the source was a third-party distributor or the PV itself. That is because of the likelihood that multiple DAPAs and PVONs exist for that same item, and because the PV and its sister companies are allowed to participate by holding a DAPA for that item.

93.     The orders directed to DAPAs held by Cardinal Companies or Owens & Minor Companies, furthermore, allow the them to collect a sales tracing fee from manufacturers. The Defendants also broaden their profit margins by paying discounted wholesale prices (commanded by their bulk-purchasing power) without passing on to the government the savings attributable to bypassing a mid-level distributor. The Relator is informed and believes, and therefore alleges that the tracing fee is typically 3% of the wholesale price.

94.     Defendants are not only diverting DAPA purchases to themselves in this manner, they also are facilitating purchases through the ACPOP of items in their inventory that already have DAPAs, in violation of the PVs' contractual obligation to sell the DAPA items instead of filling the ACPOP orders. Such sales may come at higher delivered prices, which is what the DAPA was designed to prevent.

95.     However, even when the delivered price is lower for an ACPOP item than its DAPA alternative, perhaps because the PV is not allowed to include a delivery fee in the sale of ACPOP items, the PV gains substantially from those sales.  While a DAPA holder receives the agreed-upon DAPA price and the PV receives the delivery fee from the sale of a DAPA item, a PV selling the same item under ACPOP retains the entire purchase price for the item, while benefiting from any wholesale discounts it has captured through its bulk purchasing power.  Again, the PV also collects any tracing fees from such transactions.

96.     Under the terms of the PV contracts, such sales of ACPOP items for which a DAPA existed could not have occurred but for the PV's failure to timely assign PVONs and/or to ensure that its automated system converted offending transactions into DAPA sales.

97.     Each ACPOP sale made despite the existence of a DAPA for that item constitutes a breach of the PVs' contracts with the DoD, which require PVs to convert the offending ACPOP order into a DAPA transaction and report the inappropriate ACPOP orders.  Where such a transaction occurred in conjunction with the omission and/or misrepresentation of PVON data for the same or similar items, the presentation of a claim for payment for the ACPOP item was based upon, and caused by, a knowingly false statement by the PV.

### Shilog Discovers Diversion of DAPA Orders

98.     Shilog first obtained DAPAs for participation in the PV Program in or about 1996.

99.     Sales under the DAPA program progressed substantially each year as Shilog captured a greater share of markets around the country.  In the year 2001, however, sales peaked and began a downward slide that, in some years, was precipitous.

100.     In 1996, Shilog's DAPA sales totaled a mere $19,260.  That total grew each year

to $156,667.18 in 1997, $217,759.74 in 1998, $361,233.60 in 1999, $523,657.71 in 2000, and $1,120,870.23 in 2001.

101.    Shilog's DAPA sales plunged in 2002 to $490,715.50 and never rebounded to their 2001 level although Shilog changed nothing significant about its operations.  DAPA sales totaled $502,525.15 in 2003, $493,937.27 in 2004, $696,560.32 in 2005, $184,479 in 2006, and $164,849 in 2007.

102.    From 2002 through 2006, Shilog's officers and agents sought reasons for the declines by contacting customer representatives at military facilities, visiting sites to ascertain any changing preferences or purchasing trends, and contacting other, sometimes competing, vendors.  Answers were not readily apparent and it was not until in or about October 2006 that Shilog determined that Defendants were acting illegally as to Shilog, and potentially as to the United States as well.

103.    Through their contacts within the medical supply industry and patronizing military facilities, and in conjunction with their knowledge of the PV Program, Shilog determined that Defendants were using their positions as PVs to divert sales away from Shilog and other medical suppliers.

104.    Shilog sent an agent to at least thirteen military facilities in Texas, North Carolina, Georgia, and South Carolina to conduct inquiries into its declining sales to those facilities.

105.    For example, Shilog learned from several military facilities from whom the company was receiving fewer purchase orders that the facilities were still purchasing the same medical supplies and believed those supplies to be coming from Shilog.  The Relator is informed and believes, and therefore alleges, that in such instances the relevant Defendant PV had stopped

applying PVONs associated with Shilog's DAPAs and was applying alternative PVONs associated with DAPAs held by that PV.

106.    Specifically, Shilog received such information from purchasing agents at the William Beumont Army Medical Center and Darnell Army Medical Center, both in Texas, in 2008 and 2009.

107.    The Relator determined from those and other investigations that both Cardinal Defendants and Owens & Minor Defendants engaged in this conduct.

108.    For example:

    a)   Relator experienced significant overall declines in orders from DoD facilities for Part No. 13-1024 from 1999 through 2010. During its investigation of such declines, Relator was told by a purchasing officer at the William Beaumont Army Medical Center that its consumption of Part No. 13-1024 had not been reduced and that the facility believed it was purchasing this product from Shilog.

    b)   Shilog sold 120 cases of 13-1024 to that medical center in April 2008, which was the last such sale until sales of ten or fewer cases were made in December 2008.  The medical center informed Shilog in August 2008, however, that it had purchased at least twenty-two cases in each of the previous three months and believed they came from Shilog.

    c)   Similarly, the same facility reported to Shilog in August 2008 that it believed it was still purchasing Part No. 10-5400 from Shilog, although the last order for this item received from any DoD facility was on January 27, 2007. Relator is informed and believes, and therefore alleges, that Shilog was at all

times relevant to this action the only DAPA holder for Part No. 10-5400 and that these sales were made through ACPOP.

d) Purchasing officers at other United States facilities reported similar experiences that were likewise inconsistent with the Relator's actual sales to facilities whose Prime Vendor was an Owens & Minor Defendant.

109.   Relator is informed and believes, and therefore alleges, that in those cases, and on a continuing basis, the Cardinal Defendants and/or their Customer Service Representatives supplied United States officials charged with purchasing those items with information related to either a DAPA held by a Cardinal Company, or ACPOP, which the facility used to purchase the item without realizing it was not ordering from Shilog as it had requested.

110.   Additionally, on several occasions, Cardinal Defendants' employees contacted Shilog inquiring about the status of shipments for which Shilog had no purchase orders. During its investigations of such incidents, Shilog questioned the medical supply vendors for the products supposedly ordered by a medical facility and learned that Cardinal Defendants had purchased the items directly from the vendor rather than from Shilog. Those calls and other similar calls from Defendants were bureaucratic errors by the PVs that contributed to Shilog's understanding that the PVs were violating their contracts with the United States.

111.   Based on Shilog's experience with and knowledge of the PV Program, Shilog deduced that the diversion of sales indicated by its declining sales data and the evidence from other sources could only be accomplished if the PVs were selling items associated with their own DAPAs held by Cardinal Companies or Owens & Minor Companies rather than Shilog's DAPAs, or the PVs were otherwise selling items for which Shilog held a DAPA but directly from the PVs' own inventory under ACPOP.

112.   Shilog had evidence that both types of diversions were occurring:

a)   Shilog had tracked sales to former customer facilities that believed they were still purchasing Shilog supplies and discovered those orders were filled with items associated with DAPAs held by Cardinal Companies and Owens & Minor Companies and/or sold under ACPOP.

b)   Shilog also knew, by comparing monthly submissions to the PVs of new items to be sold under Shilog's DAPAs with monthly updates of the Master Catalog by the PVs that the PVs were not timely assigning PVONs as required by their contracts with the DoD.  Indeed, some products have gone for many years without such assignment.

c)   Upon investigating the long decline in its sales, Shilog came to recognize that the PVs' control over the program through Master Catalog updates and PVON assignments, and on the customer end with CSRs placed in DoD facilities to conduct the purchasing, allowed the PVs to not only divert sales to items associated with the PV's DAPAs or those held by sister corporations but also to make sales directly from their own inventory.

d)   Shilog recognized that in so doing, the PVs were reaping the benefit of savings and fees that the PV Program was not designed to provide them, while eliminating the competition that the program was designed to engender, and that the PVs were not passing along any of that savings to the United States.

113.   Shilog also obtained data from Cardinal in the course of private litigation initiated in October 2006, in which Shilog alleged that Cardinal had tortiously interfered with exclusive contracts Shilog held with certain manufacturers for the sale of medical supplies to DoD

facilities by purchasing those supplies and selling them to DoD facilities in circumvention of Shilog's exclusive contracts, and that Cardinal violated the Oklahoma Antitrust Reform Act. This data is subject to a protective order entered in the District Court in and for Pittsburgh County, Oklahoma, and has not been publicly disclosed.

114. The discovery data informed Shilog's already substantial understanding of Cardinal's conduct.

115. The Relator is informed and believes, and therefore alleges, that the conduct of the Defendants in knowingly diverting sales to items sold under DAPAs held by the PVs or their sister corporations in circumvention of the program's core objectives, and of selling DAPA items directly from their own inventory under the ACPOP label in violation of the PVs' express contractual obligations were ongoing occurrences at least through 2011.

116. Based upon its discussions with other suppliers in the PV Program, its own experience with the PV Program, its knowledge of the program's rules and the conduct of the PVs, and the data obtained directly from Cardinal in private litigation, Shilog is informed and believes, and therefore alleges, that the conduct of these Defendants is and has been pervasive in the PV Program to the extreme detriment of the United States.

117. The Defendants' knowing omissions and misrepresentations of material facts to the United States by and through their creation, management, and distribution to government facilities of data necessary for a true and accurate representation of the items available for purchase caused the United States to make purchasing decisions that it would not have made had it known the truth about the information presented, and therefore the claims for payment associated with those sales submitted by the PVs, and paid by the United States, were false claims within meaning of the False Claims Act.

118.    The effect of the PVs' material omissions and misrepresentations is not limited to facilitating and causing the false claims to be presented to the United States with respect to the Department of Defense.   Because the data misrepresented by Cardinal was used by other government agencies, including the Department of Veterans Affairs, for the same purposes, with the same policy objectives, and under substantially the same duties imposed by contract and common law, these misrepresentations caused Cardinal to submit, and the United States to pay, false claims with respect to those programs as well.

119.    The conduct alleged herein has severely undermined the effectiveness and credibility of the PV Program, caused substantial market distortion, and contributed directly to an anti-competitive atmosphere by discouraging and stunting competition.

120.    The Defendants have reaped hundreds of millions of dollars in financial benefits from these practices.

## The Global Effect of the Defendants' Conduct

121.    Shilog's own investigation demonstrates that the Defendants have caused false claims to be submitted to the United States, but the aggregate effect of this conduct is illustrated by other evidence that provides context for Shilog's experience.

122.    As previously discussed, the expansion of the PV Program and its reliance on DAPAs should have resulted in the phasing out of significant ACPOP purchases over time. However, as will be further detailed below, sales data from the DoD shows that the United States has paid the Defendants and their companies escalating proportions of total medical/surgical spending for items under ACPOP, including items that could and should have been purchased under DAPAs, and for items that the Defendants listed as being of unknown origin.   Such purchases have accounted for nearly one third of all spending in this program since 2006.   As

detailed below, those sales totaled more than $716.6 million since 1998.

123.    The Relator is informed and believes, and therefore alleges that the transactions conducted by the Defendants involving items associated with DAPAs held by Shilog are representative of the transactions conducted by the Defendants of items associated with DAPAs held by other distributors, with the exception of transactions in which a Cardinal Company or Owens & Minor Company sold an item under its own DAPA.

124.    The Relator also is informed and believes, and therefore alleges, that the conduct described herein is reflected by global sales of all items sold to DoD facilities through the Prime Vendor Program from 2000 through at least 2011, representative samples of which are described herein.

125.    In 1998, total sales under the Medical Surgical program were approximately $25.6 million. By comparison, those sales amounted to approximately $506.4 million in 2008.

126.    Defendants have derived benefits disproportionate to their contractual role in the PV system and to any conceivable objective for their participation.  In 1998, items sold to DoD facilities that benefited only the Defendants—because they were covered by a DAPA held by Cardinal Companies or Owens & Minor Companies, were in Defendants' inventory and sold through ACPOP, or were of unidentified origin—totaled approximately $3.6 million, or 14.08 percent of all sales.  In 2008, by comparison, such sales benefiting only Defendants or their related companies (including the items of unknown origin identifiable by DAPA numbers listed as "Not in DAPA" or "Unknown") totaled approximately $196.16 million, or 38.74 percent of all medical/surgical sales to DoD facilities.

127.    The sales of items under ACPOP and items whose origins the Defendants could not identify have risen annually, reaching a combined $161.1 million in 2008. These sales were

conducted outside the parameters of the DAPA program if, as the Relator is informed and believes, and therefore alleges, they were made contrary to the PVs' contractual obligations to assign PVONs and present to government facilities a true and accurate representation of their options and without disclosure of those material omissions and misrepresentations upon presentation of claims for payment.

128.    Cardinal Companies also have especially benefited by increasing sales of items offered under their own DAPAs.  Again, the reason that the program originally did not allow PVs to also hold DAPAs was to prevent the PVs from obscuring the program's effectiveness in controlling prices due to the PVs' ability to name a sales price while also controlling the cost of delivery.  Events have born out that concern.

129.    In 1998, Cardinal Companies sold items under their own DAPAs totaling approximately $1.7 million.  Those sales grew to nearly $35.1 million by 2008, with annual increases beginning in 2003 to $25.1 million, $26.7 million, $28.3 million, $29.8 million, and $37.4 million in 2007, respectively.

130.    All told, Cardinal Companies' sales of their own DAPA items from 1998 through 2008 totaled approximately $253.3 million during the period that the Relator's data covers (or nearly 9.3 percent of all sales to DoD facilities in that period).

131.    The Relator is informed and believes, and therefore alleges, that Cardinal's influence over purchasing decisions by individual purchasing facilities through its use of Customer Service Representatives, its practice of delaying the assignment of PVONs, and its global knowledge of the prices and availability of items under competing DAPAs allowed Cardinal Defendants to divert sales to their own companies' DAPA items.

132.    Defendants' position in the marketplace also allowed them to improperly benefit

from the ACPOP program.

133.    Beginning in 2002, Defendants' sales through ACPOP saw substantial annual leaps.   In 2002, Defendants sold items for a total of approximately $7.35 million to DoD facilities through ACPOP.   Defendants' ACPOP sales then skyrocketed.   Annual sales under ACPOP from 2003 through 2008 were approximately $12.7 million, $61.55 million, $84.76 million, $121.16 million, $155.93 million, and $161.02 million, respectively.   Through the first quarter of 2009, ACPOP sales amounted to nearly $616.95 million.

134.    More than $551 million of those sales were ACPOP sales for which no DAPA could be identified.   Those sales grew by 85 percent from 2005 through 2008 and, the Relator is informed and believes, and therefore alleges, continued to increase through at least 2011.

135.    Not only does the growth in ACPOP transactions reflect a breakdown of the program as it was intended to operate, with DAPA as the preferred purchasing mechanism, but as Shilog concluded based on its own investigations, the Defendants have sold items from inventory, under ACPOP, when a DAPA was available and should have been used.

136.    Each of these transactions constitutes a violation of the False Claims Act when a claim for payment was made without disclosure of the material fact that the transaction was not converted to a DAPA sale and notifications made, as required by the PV contracts, which constituted facts material to the government's decision to pay.   The Relator is informed and believe, and therefore alleges, that the Defendants knew those items were sold under an existing DAPA, that they were required to sell the DAPA item, and that they had a duty to report to the United States when such a purchase was attempted, but the Defendants did not disclose these failures to the United States when they submitted their claims for payment.

137.    Of the $616.95 million claimed by the Defendants as ACPOP sales from 1998

through the first quarter of 2009, $65.935 million was for items that the DSCP has identified as having a DAPA.

138.    Defendants were contractually obligated to catch errors by purchasing facilities ordering items under ACPOP rather than DAPA, to charge the DoD the DAPA price, to sell the DAPA item, and to report the errors to prevent their repetition.  Nevertheless, Defendants have routinely made false claims for payment from the DSCP that an item was purchased under ACPOP when a DAPA was indeed available.

139.    Furthermore, Defendants submitted to DSCP erroneous claims with missing DAPA holders and listing the DAPA numbers as "Not in DAPA" or "Unknown."  Such claims, totaling approximately $99.66 million from 1998 through 2008, reaching $41.93 million in 2003.

140.    Defendants were contractually obligated to ensure that claims they submitted to the DSCP for payment of sales to purchasing facilities, which the Defendants facilitated and in many cases controlled through the use of CSRs, were complete and accurate representations of the transactions as products of a competitive process that the PV Program was established to create.  The United States, however, has paid Defendants nearly $100 million that cannot be accounted for, and therefore the data presented a false representation of the competitive process that the Defendants knew was the primary objective of their contracts with the United States.

141.    Combined, claims submitted to the government under ACPOP and with DAPA numbers reported as "Not in DAPA" or "Unknown" accounted for more than 30 percent of total sales to DSCP purchasing facilities in 2006, 2007, and 2008.

142.    Furthermore, in sales of items amounting to about $41.5 million, the Defendants failed to identify the DAPA holders for the items sold.  It is unclear whether any of those sales reached the DAPA holders due to this erroneous reporting, and it is possible that the Defendants

captured some, if not all, of those sales.

## Defendants' Diversion of Sales to Themselves

143. The Defendants have increased their share of both DAPA and ACPOP sales by repeated violations of their contracts with DSCP, and therefore the submission of false claims for payment when the Defendants failed to disclose those violations and the information was material to the government's decision to pay.

144. First, although an item was offered with a DAPA, the Defendants often sold it to DoD facilities through ACPOP. For example, beginning in 2006, the Cardinal Defendants sold Part No. 11300 manufactured by The Brewer Company through ACPOP to facilities that included, on numerous occasions, the facility identified by the DoD Activity Address Codes (herein "DODAAC") as WK4FV7. That was despite the availability of a DAPA held by Shilog, which the Defendants ceased to use in favor of ACPOP.

145. The Relator is informed and believes, and therefore alleges, that the Cardinal Defendants repeatedly sold items such as Part No. 11300 with an ACPOP prefix followed by a DAPA number, and that each such transaction reflects a breach of DSCP policy and the Defendants' contractual obligations because a DAPA was available. Furthermore, because the Cardinal and Owens & Minor Defendants were the only PVs at all times relevant to this action, there is no question that they were aware that such DAPAs existed.

146. Even when the per-unit price of an item is lower for ACPOP sales than DAPA sales, the Defendants derived substantial financial benefits, as described above, from selling through ACPOP rather than crediting a competitor's DAPA.

147. Defendants' Companies also derived substantial financial benefits from selling through ACPOP when the price was higher than an available DAPA item. For example, the

Cardinal Defendants charged the Navy an exceedingly high amount for Part No. 11300 on January 13, 2010.

148.    The Relator is informed and believes, and therefore alleges, that the Defendants have routinely sold items under ACPOP for which a DAPA was already well established.  For example, beginning on April 3, 2008, and through at least the first quarter of 2010, Cardinal Defendants sold Part No. 913182 manufactured by TIDI Products LLC through ACPOP.

149.    During the same period, Cardinal Defendants also sold the same item using Shilog's DAPA code on at least 50 occasions. Such dual use of the DAPA and ACPOP systems is contrary to DSCP policy and the Defendants' contractual obligations.  Relator is informed and believes, and therefore alleges, that due to their control over the PV Program data and continuing oversight of the program in all DoD regions at all times relevant to this action, the Defendants knowingly submitted these false claims for payment to the United States.

150.    The Relator is informed and believes, and therefore alleges, that in hundreds of instances, the Defendants listed the Manufacturer of items as Shilog, which is necessarily false because Shilog in not a manufacturer of any items.  In such cases, it is unclear whether the DAPA holder for those items actually received payment for those DAPA sales because the Manufacturer Name is listed as Shilog.  Furthermore, in many of these instances, Defendants attached no PVON to these transactions or reported inconsistent PVONs for transactions involving the same item.

151.    Again, as PVs, the Defendants were obliged to assign PVONs to every DAPA item within a time period prescribed by their contracts with DSCP; the failure to either assign a PVON or to report the PVON of an item sold to DSCP constitutes a false claim for payment when made without disclosing that material fact to the United States.

152.   The claims submitted to the United States containing such errors were therefore false.   The Relator is informed and believes, and therefore alleges, that the false information supplied to the United States caused the government to make purchases it otherwise would not have made and to pay claims submitted by Defendants that it would not have paid had the omissions and misrepresentations been disclosed, resulting in unfair accrual of financial rewards to Defendants to the detriment of competing suppliers.

153.   The Relator also is informed and believes, and therefore alleges, that the Defendants converted sales to ACPOP transactions although Shilog's DAPAs covered those items.

154.   The Relator also is informed and believes, and therefore alleges, that on numerous such occasions, the per-unit price under ACPOP was substantially higher than the per-unit price paid under DAPA.   Again, Defendants captured substantial financial benefits from selling these items from their own inventory rather than under Shilog's DAPA.

155.   Despite the clear contractual requirement that a PV convert ACPOP orders to DAPA sales when available and to report repeated ACPOP orders for items available under DAPAs by the same purchasing facility, Defendants processed such orders repeatedly.

156.   Shilog, for example, was completely cut out of DoD purchases of certain products for which it held DAPAs due to the Defendants' repeated ACPOP transactions of those items to the same purchasing facilities.

157.   For example, Defendants sold a single item, Part No. 2923676, under Shilog's DAPA through 2004 but then shifted to the exclusive sale of that same item under ACPOP beginning in 2005.   The Relator also is informed and believes, and therefore alleges, that the per-unit price of the ACPOP items was substantially higher than the per-unit price of the same item

offered under Shilog's DAPA.

158.   Such a shift in purchasing method, with its attendant upward shift in price, illustrates the mechanisms behind the Defendants' explosive growth in income from ACPOP transactions beginning in 2002, compared to the relatively modest gains of DAPA transactions over time.

159.   Sales by the Defendants under ACPOP of items available under DAPAs constitute clear violations of the Defendants' contractual obligations and deprived distributors, including Shilog, of substantial government sales.  Each sumbission of a claim for payment for ACPOP orders made by the United States under those conditions, without disclosure by Defendant companies that a DAPA in fact existed, constitutes the knowing submission of a false claim for payment due to the omissions and misrepresentations that were material to the government's decision to pay.

160.   The Defendants' improper diversion of sales through ACPOP had severe financial consequences for DAPA holders.  For example, Shilog Ltd., did not receive at least $2.5 million in sales made under ACOP.  The Relator is informed and believes, and therefore alleges that many other distributors also lost substantial sales as a result of this conduct.

161.   From 1998 through 2009, Cardinal Companies also sold more than $14.5 million under ACPOP for items offered under their own DAPAs.  When it was a Cardinal subsidiary, Alaris Medical Systems also sold items under ACPOP totaling $341,959 even though it held a DAPA for them as well.  These claims were, therefore, false and knowingly made.

162.   The Relator is informed and believes, and therefore alleges, that the Defendants' conduct in violation of the False Claims Act directly caused the failure of the PV Program to provide a reliably competitive marketplace from which government facilities could purchase

medical supplies within the DAPA system.

163.    The conduct described herein constitutes breaches of the Defendants' contracts with DoD and also false or fraudulent claims when payment was sought without disclosure of facts material to the government's decision to pay, as Defendants had a duty to disclose.  The diversion of DAPA orders to the PV is a false claim to the United States when the PVs knew they were required to facilitate the purchase of items in a competitive process and that such competition was the very purpose for the PV Program.

164.    It is a fundamental tenet of competitive bidding processes that no party be privy to the global sales data provided by competitors, including their bid prices, and then be allowed to compete for the government's business.  Yet Defendants have been given access to all data from competitors while also being allowed to hold DAPAs of their own and provide to purchasing facilities the personnel responsible for aiding in the selection process.   Their abuse of that privilege constitutes pervasive violations of the False Claims Act.

165.    Moreover, purchasing facilities and the PV CSRs assigned to them, are expected to compare DAPA items with equivalent products to select the most cost-effective item for the facility.  Yet the DoD relies on Cardinal Health, Inc., through its Supplyline computer product, to filter data and to assign codes that ultimately are used to make such equivalency decisions. Thus, Cardinal Health, Inc., and/or one or more of its subsidiaries are also defining which products are to be compared to each other in the competitive selection process.

166.    The Relator is informed and believes, and therefore alleges, that Cardinal Health, Inc., has used its control over the Supplyline data process to glean additional advantages in the sale of its own subsidiaries' DAPA items and the use by Cardinal Defendants of ACPOP.

167.    The contracts also require PVs to charge DAPA prices and sell the DAPA item

when an item is improperly ordered through ACPOP, and to report the faulty orders to the United States. The Relator is informed and believes, and therefore alleges, that is not happening and that the PVs have been engaged in conduct that maximizes their use of ACPOP sales, and thus their market shares.

168.    The Relator is informed and believes, and therefore alleges, that this process has caused the number of competing distributors to decline by diverting sales from competing DAPA holders to the Defendants either by using a DAPA held by a Cardinal or Owens & Minor company or by purchasing an item stocked by Defendants under ACPOP.

169.    Cardinal Health, Inc., is directly liable for the actions described herein and ascribed to the conduct of Cardinal Defendants and/or Cardinal Companies.

## FIRST CLAIM FOR RELIEF
### (Knowing Presentation of False Claims – 31 U.S.C. § 3729(a))

170.    Relator incorporates herein by reference the allegations contained in paragraphs 1 through 169 as if fully set forth herein.

171.    In performing the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

172.    Defendants submitted the false claims and reports with actual knowledge of their falsity, in deliberate ignorance of the truth or falsity of the information they contained, or in reckless disregard of the truth or falsity of the information they contained.

173.    The omissions and misrepresentations committed by Defendants, as described herein, were facts material to a decision by the United States to pay those claims.

174.    The United States, upon presentation of such claims for payment, remitted payment despite the false nature of the claims.

175.   Defendants' presentation of the false claims and information to the United States was the direct and proximate cause of the United States paying false claims amounting to sums in the millions of dollars in violation of the False Claims Act.

176.   Pursuant to 31 U.S.C. § 3729(a), the Defendants are liable to the United States for a civil penalty of not less than $5,500, and not more than $11,000, for each such violation.

177.   Pursuant to 31 U.S.C. § 3729(a), the Defendants also are liable for three times the amount of damages sustained by the United States as a result of the acts described herein.

## SECOND CLAIM FOR RELIEF
### (Knowingly Making or Using False Records Material to False Claims – 31 U.S.C. § 3729(a))

178.   Relator incorporates herein by reference the allegations contained in paragraphs 1 through 177 as if fully set forth herein.

179.   In performing the acts described herein, Defendants also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

180.   Defendants submitted the false records or statements with actual knowledge of their falsity, in deliberate ignorance of the truth or falsity of the information they contained, or in reckless disregard of the truth or falsity of the information they contained.

181.   Defendants omitted and misrepresented to the United States information that was necessary for government facilities to make informed cost-effectiveness decisions, as they were required by the DoD to do, and therefore these records were false, fraudulent, and made or used to get a false claim paid.

182.   The United States, upon presentation of claims for payment for which the Defendants' false records or statements were made or used, remitted payment despite the false nature of the claims.

183.   Defendants' creation, directly or indirectly, or use of false records or statements material to false claims submitted to the United States was the direct and proximate cause of the United States paying false claims amounting to sums in the millions of dollars in violation of the False Claims Act.

184.   Had the Defendants disclosed the true nature of the information presented to government facilities at the time they made each purchasing decision, the information would have been material to the decision by the United States to pay the claim.

185.   Pursuant to 31 U.S.C. § 3729(a), the Defendants are liable to the United States for a civil penalty of not less than $5,500, and not more than $11,000, for each such violation.

186.   Pursuant to 31 U.S.C. § 3729(a), the Defendants also are liable for three times the amount of damages sustained by the United States as a result of the acts described herein.

### THIRD CLAIM FOR RELIEF
**(Piercing the Corporate Veil – Allegiance Corporation)**

187.   Relator incorporates herein by reference the allegations contained in paragraphs 1 through 186 as if fully set forth herein.

188.   Upon information and belief, Defendant Allegiance Corporation is, and was at all times relevant to the allegations contained in this Complaint, the sole member-manager of Cardinal Health 200, LLC.

189.   Defendant Allegiance Corporation exercised control, not mere majority or membership control, but complete domination, not only of the finances of the Defendant Cardinal Health 200, LLC, but of policy and business practices of Cardinal Health 200, LLC, such that at the time of Cardinal Health 200, LLC's unlawful actions and transactions with the United States had no separate mind, will or existence of its own from Defendant Allegiance Corporation.

190.    Defendant Allegiance Corporation exercises such actual domination and control over the operations and actions of the Defendant Cardinal Health 200, LLC, that the Defendant Cardinal Health 200, LLC, has no substantial identity separate from that of Defendant Allegiance Corporation.

191.    Defendant Allegiance Corporation controls and dominates the operations of the Defendant Cardinal Health 200, LLC, as a shield for Defendant Allegiance Corporation's actions taken in violation of the law and in violation of public policy.

192.    Defendant Allegiance Corporation used that control to commit wrong; to perpetuate a fraud against the United States; to perpetuate the violation of a positive legal duty to the United States, or a dishonest and unjust act in contravention of the rights of the United States; and to otherwise harm the United States.

193.    The Relator is informed and believes, and therefore alleges, that Defendant Allegiance Corporation orchestrated a scheme by which Cardinal Health 200, LLC, knowingly supplied the United States with incomplete or false information, as described herein, which the United States used to make individual purchasing decisions in the belief that the information fully represented the available options and in reasonable reliance on Cardinal Health 200, LLC's misrepresentations, which were made in direct violation of Cardinal Health 200, LLC's duties under its Prime Vendor contracts with the United States.

194.    The Relator is informed and believes, and therefore alleges, that Defendant Allegiance Corporation directed this course of conduct and the submission by Cardinal Health 200, LLC, of false claims for payment not only to benefit the Cardinal Defendants but also to benefit Cardinal Companies and Defendant Allegiance Corporation.

195.    Defendant Allegiance Corporation and Defendant Cardinal Health 200, LLC,

disregarded their relationship with the United States in favor of Defendant Cardinal Health 200, LLC's submission of false claims to the United States without disclosing, as required, the true nature of the information provided to the United States, which in reliance thereon each purchasing decision was made, while collecting distribution fees for duties that Defendant Cardinal Health 200, LLC, failed to perform and accepting payment for items sold outside the competitive process that the Prime Vendor Program was designed to establish. These wrongful acts were accomplished through the use and manipulation of Allegiance Corporation's use of fragmented Cardinal Health 200, LLC, as a shell company engaged in the business of providing prime vendor services to the United States, including information creation, management, and distribution, taking and filling orders from United States buyers, distributing items purchased by United States buyers, and filing claims for payment by the United States.

196.    Defendant Allegiance Corporation could not have accomplished the subject transactions without the total disregard of all regular and customary corporate formalities that otherwise would have prevented Defendant Allegiance Corporation from undertaking such unlawful and unauthorized transactions, said transactions being directly and proximately responsible for, and the cause of, the injuries and unjust losses to the United States.

197.    Relator is informed and believes, and therefore alleges, that Defendant Allegiance Corporation has used Defendant Cardinal Health 200, LLC, as its alter ego or as a mere instrumentality with the knowledge and intent that its conduct and activities could cause the United States to suffer damages.

198.    Upon information and belief, in operating Defendant Cardinal Health 200, LLC, Defendant Allegiance Corporation has failed to comply with corporate formalities, and so disregarded or abused any separate existence between it and Defendant Cardinal Health 200,

LLC, that any separate existence of Defendant Cardinal Health 200, LLC should be disregarded or pierced.

199.    Furthermore, Relator is informed and believes, and therefore alleges, that Defendant Cardinal Health 200, LLC, and Defendant Allegiance Corporation use the same statutory agent, principal office and business location to manage and implement their day-to-day business operations.

200.    Defendant Allegiance Corporation's overwhelming control over the Defendant Cardinal Health 200, LLC, and breach of duty proximately caused the injury and/or unjust loss to the United States.

201.    Injustice will result to the United State if Defendant Allegiance Corporation is permitted to operate Defendant Cardinal Health 200, LLC, as its instrumentality or alter ego, thereby avoiding liability for the unlawful conduct of Defendant Cardinal Health 200, LLC.

202.    Relator is informed and believes, and therefore alleges, that Defendant Allegiance Corporation organized Cardinal Health 200, LLC, as its alter ego and has at all times operated Cardinal Health 200, LLC as a mere instrumentality or tool.

203.    Defendant Allegiance Corporation and Cardinal Health 200, LLC, never had and do not now have any genuine or separate corporate existence, but Cardinal Health 200, LLC, has been used and exists for the sole purpose of permitting Allegiance Corporation to transact its business under a corporate guise.

204.    Relator is informed and believes, and therefore alleges, that Defendant Allegiance Corporation, during the time period contemplated in this Complaint, as the sole member-manager of Cardinal Health 200, LLC, has been conducting, managing and controlling the affairs of Cardinal Health 200, LLC, since its formation as if it was Allegiance Corporation's own

business. Defendant Allegiance Corporation has so intermingled its affairs with those of Defendant Cardinal Health 200, LLC, such that Defendant Cardinal Health 200, LLC, is merely the alter ego of Defendant Allegiance Corporation.

205.    Relator is informed and believes, and therefore alleges, that the Defendant Allegiance Corporation fraudulently used, as its personal instrument, Defendant Cardinal Health 200, LLC, to protect its business from any claims United States had against it.

206.    Furthermore, Relator is informed and believes, and therefore alleges, that Defendant Allegiance Corporation has commingled its corporate funds with that of Defendant Cardinal Health 200, LLC, and has substantially disregarded corporate formalities.

207.    Upon information and belief, there is a unity of interest and ownership between the Defendant Allegiance Corporation and Defendant Cardinal Health 200, LLC, which is demonstrated by the domination and control of Defendant Cardinal Health 200, LLC.

208.    Fundamental notions of justice, fair play, and fair dealings require that the actions of the Cardinal Defendants delineated above, be deemed a waiver of the protections that would otherwise be afforded by being members in a limited liability company and that any separate existence of Cardinal Health 200, LLC, should be disregarded or pierced.

209.    Relator requests that Allegiance Corporation and Defendant Cardinal Health 200, LLC, be jointly and severally liable for the injury and/or unjust loss to the United States.

## FOURTH CLAIM FOR RELIEF
### (Piercing the Corporate Veil –Allegiance Corporation and Cardinal Health, Inc.)

210.    Relator incorporates herein by reference the allegations contained in paragraphs 1 through 209 as if fully set forth herein.

211.    By virtue of its domination, control, and unity of ownership with Cardinal Health 200, LLC, Allegiance Corporation and Cardinal Health 200, LLC, are synonymous, and

therefore the Cardinal Defendants include Allegiance Corporation.

212.    Defendant Cardinal Health, Inc., exercised control, not mere majority or stock/membership control, but complete domination, not only of the finances of the Cardinal Defendants—Cardinal Health 200, Inc., Cardinal Health 200, LLC, and Allegiance Corporation—but of policy and business practices of the Cardinal Defendants, such that at the time of Cardinal Defendants' unlawful actions and transactions with Shilog and the United States, they had no separate mind, will or existence of their own from Defendant Cardinal Health, Inc.

213.    Defendant Cardinal Health, Inc. exercises such actual domination and control over the operations and actions of the Cardinal Defendants, that the Cardinal Defendants have no substantial identity separate from that of Defendant Cardinal Health, Inc.

214.    Defendant Cardinal Health, Inc., controls and dominates the operations of the Cardinal Defendants as a shield for Defendant Cardinal Health, Inc.'s actions in violation of the law and in violation of public policy.

215.    Defendant Cardinal Health, Inc., used that control to commit wrong; to perpetuate a fraud against the United States; to perpetuate the violation of a positive legal duty to the United States, or a dishonest and unjust act in contravention of the rights of the United States; and to otherwise harm the United States.

216.    The Relator is informed and believes, and therefore alleges, that Defendant Cardinal Health, Inc., orchestrated a scheme by which the Cardinal Defendants knowingly supplied the United States with incomplete or false information, as described herein, which the United States used to make individual purchasing decisions in the belief that the information fully represented the available options and in reasonable reliance on the Cardinal Defendants'

misrepresentations, which were made in direct violation of those defendants' duties under their respective Prime Vendor contracts with the United States.

217.   The Relator is informed and believes, and therefore alleges, that Defendant Cardinal Health, Inc., directed this course of conduct and the submission by the Cardinal Defendants of false claims for payment not only to benefit the Cardinal Defendants but also to benefit Cardinal Companies and Cardinal Health, Inc.

218.   The Relator is informed and believes, and therefore alleges, that Defendant Cardinal Health, Inc., directed Cardinal Companies to take actions intended to facilitate these wrongful acts by Cardinal Defendants, including the use of the Cardinal Supplyline software whose trademark has been held by a variety of Cardinal Companies at all times relevant to this action.

219.   Defendant Cardinal Health, Inc., and Cardinal Defendants disregarded their relationship with the United States in favor of Cardinal Defendants' submission of false claims to the United States without disclosing, as required, the true nature of the information provided the United States in reliance thereon each purchasing decision was made while collecting distribution fees for duties the Cardinal Defendants failed to perform and accepting payment for items sold outside the competitive process that the Prime Vendor Program was designed to establish.   These wrongful acts were accomplished through the use and manipulation of Defendant Cardinal Health, Inc.'s fragmented shell companies engaged in the business of providing prime vendor services to the United States, including information creation, management, and distribution, taking and filling orders from United States buyers, distributing items purchased by United States buyers, and filing claims for payment by the United States.

220.   Defendant Cardinal Health, Inc., could not have accomplished the subject

transactions without the total disregard of all regular and customary corporate formalities that otherwise would have prevented Defendant Cardinal Health, Inc., from undertaking such unlawful and unauthorized transactions, said transactions being directly and proximately responsible for, and the cause of, the injuries and unjust losses to the United States.

221.    Relator is informed and believes, and therefore alleges, that Defendant Cardinal Health, Inc., has used Cardinal Defendants as its alter ego or as a mere instrumentality with the knowledge and intent that their conduct and activities could cause the United States to suffer damages.

222.    Relator is informed and believes, and therefore alleges, that in operating Cardinal Defendants, Defendant Cardinal Health, Inc., has failed to comply with corporate formalities, and so disregarded or abused any separate existence between them and the Cardinal Defendants, that any separate existence of the Cardinal Defendants should be disregarded or pierced.

223.    Furthermore, Relator is informed and believes, and therefore alleges, that the Cardinal Defendants and Defendant Cardinal Health, Inc., use the same statutory agent, principal office, business location and mailing address to manage and implement their day-to-day business operations.

224.    At all times relevant to the acts alleged in this Complaint, a corporate officer of Defendant Cardinal Health, LLC, was an associate corporate counsel for Defendant Cardinal Health, Inc.

225.    Furthermore, Relator is informed and believes, and therefore alleges, that at all times relevant to the acts alleged in this Complaint, Cardinal Health, Inc., and Cardinal Defendants shared common officers, directors and/or corporate executives.

226.    Relator is informed and believes, and therefore alleges that at all times relevant to

the allegations herein, Cardinal Defendants and Cardinal Companies shared common officers, directors and/or corporate executives.

227.    Defendant Cardinal Health, Inc.'s overwhelming control over the Cardinal Defendants and breach of duty proximately caused the injury and/or unjust loss to the United States.

228.    Injustice will result to the United States if Cardinal Health, Inc., is permitted to operate Cardinal Defendants as their instrumentality or alter ego, thereby avoiding liability for the unlawful conduct of Cardinal Defendants.

229.    Defendant Cardinal Health, Inc., and Cardinal Defendants never had and do not now have any genuine or separate corporate existence, but have been used and exist for the sole purpose of permitting Defendant Cardinal Health, Inc., to transact its business under a corporate guise.

230.    Relator is informed and believes, and therefore alleges, that Defendant Cardinal Health, Inc., during the time period contemplated in this Complaint, has been conducting, managing and controlling the affairs of Cardinal Defendants since their formation as if it was Defendant Cardinal Health, Inc.'s own business.  Defendant Cardinal Health, Inc., has so intermingled its affairs with those of Cardinal Defendants such that Cardinal Defendants are merely the alter ego of Defendant Cardinal Health, Inc.

231.    Relator is informed and believes, and therefore alleges, that the Defendant Cardinal Health, Inc., fraudulently used, as its personal instrument, Cardinal Defendants to protect its business from any claims the United States had against it.

232.    Furthermore, Relator is informed and believes, and therefore alleges, that Defendant Cardinal Health, Inc., has commingled its corporate funds with that of Cardinal

Defendants and has substantially disregarded corporate formalities.

233.    Upon information and belief, there is a unity of interest and ownership between the Defendant Cardinal Health, Inc., and Cardinal Defendants, which is demonstrated by the domination and control of Cardinal Defendants.

234.    Fundamental notions of justice, fair play, and fair dealings require that the actions of the Cardinal Defendants delineated above, be deemed a waiver of the protections that would otherwise be afforded by law and that any separate existence of Cardinal Defendants should be disregarded or pierced.

235.    Relator requests that Defendant Cardinal Health, Inc. and the Cardinal Defendants be jointly and severally liable for the injury and/or unjust loss to the United States.

**WHEREFORE**, the Relator prays the Court as follows:

1.      For judgment against the Defendants, jointly and severally, in favor of the United States of America for all losses and damages that have been, or will be, sustained by the United States as a result of the violations of the False Claims Act as set forth herein, in an amount equal to three times the amount of damages, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00), and not more than Eleven Thousand Dollars ($11,000.00), for each violation pursuant to 31 U.S.C. § 3729(a);

2.      For an award to Shilog, as the *qui tam* relator, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) on the United States' recovery;

3.      For an award to Shilog of all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

4.      For punitive damages on all causes of action, to the extent allowable by law;

5.      For trial by jury on all issues so triable; and

6.      For such other and further relief as to the Court seems just and proper.

This the 28th day of February, 2012.

By: _____

Gary K. Shipman, Esq.
North Carolina Bar No. 9464
W. Cory Reiss, Esq.
North Carolina Bar No. 41549
Shipman & Wright, LLP
575 Military Cutoff Road, Suite 106
Wilmington, NC 28405
Tel.: (910) 762-1990
Fax: (910) 762-6752
*Lead Counsel*

Lanny J. Davis, Esq.
District of Columbia Bar No. 158535
Lanny J. Davis & Associates, LLC
600 13th Street, NW, Suite 600
Washington, DC  20005
Tel: (202) 756-8211
Fax: (202) 737-1141

James J. Rodgers, Esq.
Pennsylvania Bar No.: 21635
David M. Laigaie, Esq.
Pennsylvania Bar No.: 63010
Dilworth Paxson LLP
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
(215) 575-7143
(215) 575-7200 (fax)

-50-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of this Complaint and written disclosure of substantially all material evidence and information Relator possesses has been served on the Government as provided in Rule 4 of the Federal Rules of Civil Procedure.

Lanny J. Davis